# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
July 20, 2004 Session

## STATE OF TENNESSEE v. JAMES WAYNE KIMBROUGH

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2001-D-2439      Steve R. Dozier, Judge**

————————————

**No. M2003-00719-CCA-R3-CD - Filed January 31, 2005**

————————————

The appellant, James Wayne Kimbrough, was convicted in the Davidson County Criminal Court of first degree premeditated murder, felony murder, and two counts of spousal rape. Following a capital sentencing hearing, the jury imposed a sentence of life imprisonment in the Tennessee Department of Correction without the possibility of parole for his felony murder conviction. Additionally, he received a sentence of fifteen years for each of his spousal rape convictions as a Range III, persistent offender. On appeal, the appellant contends that the trial court erred in failing to grant "all aspects" of his motions to suppress, that the evidence is not sufficient to support his convictions, and that the trial court made numerous errors during the sentencing phase of his trial. Upon our review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and ROBERT W. WEDEMEYER, JJ., joined.

Richard McGee (at trial and on appeal) and Wendy S. Tucker (at trial), Nashville, Tennessee, for the appellant, James Wayne Kimbrough.

Paul G. Summers, Attorney General and Reporter; Helena Walton Yarbrough, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Katrin Novak Miller, Brian K. Holmgren, and Kathy Morante, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

In December 1999, the victim, Jennifer Kimbrough, was working at Kathy's Massage Parlor, which business was a front for prostitution. At that time, the victim was separated from her husband, the appellant, whom she had married in February 1999. The appellant had repeatedly expressed his

displeasure with the victim's job, frequently calling her a "whore." The appellant had also stated that he was "tired of" the victim's job.

On December 11, 1999, the victim requested that a co-worker, Mary Ann Heidi McMillan, drive her to The Place, a bar and restaurant located at the intersection of Nolensville Pike and Polk Avenue in Nashville. The victim, wearing a black velvet outfit and carrying a duffle bag, makeup bag, and extra clothes, entered The Place alone. After leaving the victim, McMillan drove home.

The Place was owned by Al Pedro, a friend of the appellant. While the victim and the appellant were living together, they had frequented The Place together. When the victim entered The Place on December 11, she began speaking with the appellant, who was seated at the end of the bar. The bartender, Ruth Greenfield, and Pedro witnessed the appellant and the victim repeatedly argue and then make up. Greenfield also noticed that the appellant's right hand was bandaged with gauze and had been for several days. At one point in the evening, Pedro suggested that the appellant buy the victim a drink. The victim stated that she could buy her own drinks because she had her own money. The appellant responded that "she was whoring around, and that's how she got the money."

Between 12:00 and 12:30 a.m. on December 12, 1999, the appellant and the victim left The Place together. The appellant returned to The Place alone between 2:30 and 3:00 a.m. He was no longer wearing the gauze bandage that had been on his hand earlier in the evening. In response to Pedro's inquiry regarding where he had been in the interim, the appellant told Pedro that when he left The Place, he and the victim had sat in his car and talked for a while. Afterward, the appellant went to a Waffle House and to visit his father before returning to The Place.

Thereafter, between 3:00 and 4:00 a.m. on December 12, 1999, Jean Donegan, who lived at 14566 Old Hickory Boulevard in Antioch, woke from her sleep and looked outside her window. She saw something "white" in her driveway, and woke her husband. He advised his wife that it was probably a deer and suggested that she return to bed.

Later that morning, at approximately 6:00 a.m., the Donegan's newspaper carrier, David Williams, arrived to deliver their newspaper. Because of the Donegan's age and the length of their driveway, Williams usually parked his car and walked up the driveway to the house. That morning, when he pulled into the driveway he saw something in the driveway. He initially thought the object was a dead animal. However, when Williams got out of his car and approached the object, he realized that it was a person. He was able to determine that the person was a woman and that she was dead. Williams did not have a cellular telephone; therefore, he ran back to his car, drove to his home and called 911 to report his discovery of the body.

When police arrived at the Donegan's residence, they found no identification on the body. The victim's body was battered and bloody. Police found tire tracks, a footprint, and three small silver-type beads near the body. In an effort to identify the victim or develop information that would lead to the perpetrator's identity, police spoke with neighbors and began canvassing area motels.

Ultimately, Detectives Tim Mason and David Carrell, with the Nashville Metropolitan Police Department (Metro) Murder Squad, determined the victim's identity.

Detectives Mason and Carrell also determined that the appellant, who shared the victim's surname, was registered in room 121 at the nearby Knights Inn at the intersection of I-24 and Bell Road in Nashville. During their investigation at the Knights Inn, officers discovered personal items belonging to the victim in a trash can outside room 129. The trash can was located only a short distance from room 121. The items included a black skirt, blouse, and bra; a purse; a necklace; a wallet containing the victim's identification; a makeup bag containing beige makeup and condoms; and pillowcases, towels, and a capped beer bottle all bearing the victim's blood. Also found in the trash can were a gauze bandage which was stained with beige makeup and marked with the appellant's DNA, a prescription medicine bottle bearing the appellant's name, and a Coke can with the appellant's fingerprint. A beer can bearing the victim's fingerprint was found either in the trash or in room 127, a room which was also searched by police in connection with the case.

After discovering the appellant's name and the victim's belongings in the trash can, a search warrant was obtained for the appellant's room at Knights Inn. The search of the room yielded few clues. Thereafter, Detective Mason learned that the appellant was at The Place. Detective Mason proceeded to The Place and took the appellant into custody. While in custody, the appellant consented to a search of his car.

During the search of the appellant's car, officers discovered a small silver bead and a blank notepad. However, they noticed that the pad bore imprints of writing. A technique called "cross-lighting" revealed what had been written on the page preceding the blank page. The indentation revealed the following note:

> I don't want nothing to do with you. You are a liar. I will be back for
> my stuff. Leave me alone. Whatever you are doing, keep on. No,
> I'm not your wife anymore. So, f**k you. Don't call me at all. I hate
> slut puppy you.

Finally, a Luminol test revealed the presence of blood in the appellant's vehicle.

Dr. Janet Ruth Pillow testified at trial that on December 13, 1999, she conducted an autopsy on the victim. Dr. Pillow stated that when the victim's body was received, there was dried blood on the victim's face, around her pubic area, along her thighs, and around her rectum. Dr. Pillow observed bruising around the victim's eyes and abrasions to her left eye, chin, and neck. Yellow abrasions running parallel to each other extended from the victim's left knee to the top of the left foot. The same yellow abrasion pattern was observed on the right ankle and right foot. The yellow color of the abrasions indicated that the abrasions occurred after the victim's death.

Dr. Pillow said that the victim had blood around and inside her mouth. She found in the front part of the victim's mouth what appeared to be tissue. Additionally, in the farthermost part of the

victim's throat, Dr. Pillow discovered a "black object." Upon removal, Dr. Pillow determined that the object was a pair of women's panties. Farther back in the throat, Dr. Pillow found a panty shield. The items were packed "very tightly" in the victim's throat, requiring the use of forceps for removal.

Dr. Pillow described the injuries to the victim's genital area. She related that the opening into the vagina was lacerated and she found blood around and within the vagina. Deeper into the vagina, Dr. Pillow found more extensive lacerations. At the uppermost part of the vagina, adjacent to the cervix, was a laceration measuring four centimeters. The laceration extended through the full thickness of the vagina into the pelvic cavity. Additional multiple small lacerations were also found. Dr. Pillow concluded that these injuries occurred while the victim was alive. Dr. Pillow opined that an unopened capped beer bottle "coming into contact with vaginal tissue would be capable of producing this type of injury."

Upon her examination of the victim's rectum, Dr. Pillow found "many lacerations of varying sizes, all around the anus and even extending as much as four inches into the anal opening, into the lower intestine." The presence of blood and bruising farther into the pelvic cavity indicated that the victim was alive when the injuries were inflicted. Further, Dr. Pillow testified that "[a]s the abdomen was being opened, before it had been completely opened, there was a white, foreign object readily apparent in the abdominal cavity. . . . Then the abdomen was completely opened, and that foreign object was a white, aerosol can." Dr. Pillow stated that the tip of the can had nearly reached the victim's diaphragm.

Dr. Pillow explained that the aerosol can would not have fit through the laceration of the vagina. However, "[t]here was a laceration through the rectum, the lower part of the rectum, four inches inside the rectum from the anal opening." This laceration "went through the full thickness of the wall of the rectum," continuing on "a path of lacerations in the small bowel mesentery." Dr. Pillow further explained that "[t]he path could be followed from the laceration in the rectum through these lacerations in the mesentery and the hemorrhages, to the point of the aerosol can."

Regarding the cause of the victim's death, Dr. Pillow observed that

> [h]emorrhages extended from the top of the neck, in the area of the hyoid bone, the thyroid cartilage, which is a larger cartilage that lies just below the hyoid bone. In fact, the hemorrhage continued to just below the thyroid gland.
>
> There was also hemorrhage that extended behind the esophagus, or the food tube it might be commonly called. In fact, the hemorrhaging extended from the front of the neck all the way to the anterior part of the cervical vertebrae, or the bones of the back of the neck.

-4-

From these observations, Dr. Pillow opined that the victim died as a result of manual strangulation by a hand or hands.

Dr. Pillow explained that "victims of strangulation do not actually die from suffocation or having their air cut off; they die from lack of oxygen to the brain." Additionally, Dr. Pillow maintained that death would occur in three to seven minutes during manual strangulation if the pressure on the neck remained constant. However, in cases involving a struggle "survival could be . . . a few minutes longer."

At the conclusion of trial, the appellant was found guilty of premeditated first degree murder, first degree felony murder, and two counts of spousal rape. The trial court merged the first degree premeditated murder conviction into the appellant's conviction for felony murder. At the conclusion of the penalty phase, the jury sentenced the appellant to life imprisonment without the possibility of parole for the offense of felony murder. Thereafter, the trial court imposed a sentence of fifteen years for each of the spousal rape convictions, which sentences were to run concurrently to each other but consecutively to the conviction for felony murder, for a total effective sentence of life without the possibility of parole plus fifteen years. On appeal, the appellant challenges the trial court's rulings regarding his motions to suppress, the sufficiency of the evidence supporting his convictions and sentencing.

A. Motions to Suppress

Prior to trial, the appellant filed several motions to suppress evidence, raising numerous issues. Specifically, the appellant challenged the initial warrantless entry into his motel room, the validity of the search warrant issued for the search of his motel room, his warrantless arrest, the search of his vehicle, and the admissibility of his statements to police following his arrest. On appeal, the appellant argues that the trial court should have granted his motions to suppress "in toto."

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Moreover, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

The first witness to testify at the hearing on the appellant's motion to suppress was Detective Tim Mason. Detective Mason testified that on December 12, 1999, the victim's body was

discovered a short distance from the Knights Inn on Bell Road and I-24. While a search was being conducted of area motels, the victim was identified through a fingerprint match. Shortly after the victim's identity was established, Detective Mason talked with a clerk at Knights Inn and discovered that the appellant was registered in room 121 of the motel. Further investigation revealed that the victim and the appellant were once arrested at the same time and had provided the same address. Based upon that information, along with the knowledge of the shared surname, police surmised that there might be a connection between the victim and the appellant.

Detective Mason testified that because of his concern that the appellant might also be injured or dead, he entered room 121 using the manager's key. No one was in the room; in fact, the room appeared to have been vacated. Without conducting a full search, Detective Mason exited the room and left to obtain a search warrant for room 121. Prior to obtaining the warrant, police discovered items belonging to the victim in a trash can located a short distance from the appellant's room at the motel.

After the items were found in the trash can, the search warrant was obtained and executed. While the Identification Unit (ID) processed room 121, Detective Mason went to the appellant's residence at Danby Drive and Harding Place to interview the appellant's father, Grady Kimbrough. Kimbrough told Detective Mason that he also was looking for the appellant and the victim because they had "knocked him around and robbed him." He opined that the appellant might be at The Place.

Following this lead, police arrived at The Place at 3:00 p.m. on December 12, 1999, and found the appellant's vehicle in the parking lot. Detective Mason used a photograph of the appellant in order to identify him. Approximately fifteen minutes after police arrived, Detective Mason witnessed the appellant emerge from The Place.

After the appellant got into his vehicle, Detective Mason approached the driver's side of the vehicle with his gun drawn. With the help of another officer, Detective Mason pulled the appellant from the car, placed him on the ground, and handcuffed him. Detective Mason explained that the appellant was a suspect in a murder; thus, he did not want to approach the appellant unarmed. Detective Mason told the appellant that his wife was dead and the police needed to talk to him. Then, before placing the appellant in the back of a marked police car, Detective Mason informed him of his <u>Miranda</u> rights.[1] At the suppression hearing, Detective Mason recalled, "I asked him to come downtown with us so we could talk and get it straightened out, if he wasn't involved, we'd let him go home." However, Detective Mason stated that the appellant would not have been free to leave at that point.

While the appellant was seated in the police car, Detective Mason asked him for permission to search his car. The appellant signed a consent to search form at 3:55 p.m. while he was seated in the rear of the police car. Another officer transported the appellant to the Criminal Justice Center

---

[1] See <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602 (1966).

(CJC). Detective David Carrell arrived at the CJC shortly thereafter and conducted the interview of the appellant.

Detective Carrell testified that he was unaware of the circumstances surrounding the appellant's apprehension. He stated that he believed the appellant had agreed of his own volition to come to the CJC to speak with police. Detective Carrell recalled that when the appellant was informed of the victim's death, the appellant initiated conversation relating to when he last saw the victim, claiming he saw her briefly on the night of December 11, 1999, at The Place and that he had bought her a drink. After a short discussion, during which the appellant gave three versions of a possible alibi for himself, Detective Carrell asked the appellant to submit to a polygraph examination. Detective E.J. Bernard conducted the examination and informed Detective Carrell that the results indicated the appellant was being untruthful, particularly regarding his knowledge of the victim's death.

Based upon this information, Detective Carrell strongly believed the appellant to be a suspect in the victim's death. He read the appellant his Miranda rights, and the appellant signed a waiver of those rights. Prior to the reading of the rights, Detective Carrell noticed brown and red stains on the appellant's jacket. Detective Carrell believed that the red stains were blood and the brown stains were similar to makeup found in the trash can containing the victim's belongings. The appellant's jacket, shoes, and necklace were taken for testing. Additionally, the appellant's hands were photographed because they were covered with scratches.

As we have noted, the appellant contends that the trial court should have suppressed information obtained during the search of his room at the Knights Inn, during the search of his vehicle, and his statements to police following an allegedly illegal arrest. We will address each of those issues in turn.

### 1. Room 121

The appellant first challenges the search of room 121, the room he had rented at Knights Inn. We will examine both Detective Mason's initial, warrantless entry into the room and the subsequent search which was conducted pursuant to search warrant.

### a. Warrantless Entry

Both the Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution provide protection for citizens against "unreasonable searches and seizures." Generally, a warrantless search is considered presumptively unreasonable, thus violative of constitutional protections. See State v. Walker, 12 S.W.3d 460, 467 (Tenn. 2000). The same protection enjoyed by a citizen in his home is extended to a citizen in a "hotel room[] and other temporary living spaces." State v. Ross, 49 S.W.3d 833, 840 (Tenn. 2001).

At the conclusion of the appellant's suppression hearing, the trial court entered a lengthy and detailed order denying in part and granting in part the appellant's motion to suppress. In the order, the trial court found that Detective Mason's initial entry into room 121, which Detective Mason stated was for the purpose of checking for other potential victims, was illegal. The trial court found that because the appellant had a legitimate expectation of privacy in room 121, "the warrantless search of the room was illegal unless it [fell] within an exception to the warrant requirement." On appeal, the appellant contends that the trial court was correct in finding that the initial entry into room 121 was illegal.

Exigent circumstances may exist in any one of the three following situations:

> "(1) when the officers [are] in hot pursuit of a fleeing suspect; (2) when the suspect represent[s] an immediate threat to the arresting officers or the public; and (3) when immediate police action [is] necessary to prevent the destruction of vital evidence or thwart the escape of known criminals."

State v. Rodney Ford, No. 01C01-9708-CR-00365, 1999 WL 5437, at *3 (Tenn. Crim. App. at Nashville, Jan. 7, 1999) (quoting Jones v. Lewis, 874 F.2d 1125, 1130 (6th Cir. 1989)). Further, "[i]n addition to the 'exigent circumstances' situations set out in Ford, law enforcement officers may also make a warrantless entry in an emergency to protect human life." State v. Robbie W. Fields, No. E2004-00716-CCA-R3-CD, 2005 WL 35184, at *6 (Tenn. Crim. App. at Knoxville, Jan. 7, 2005.)

In the instant case, after examining the proof presented supporting the State's claim of exigent circumstances, the trial court commented that

> [n]oticeably absent from the record, however, is any basis for a belief that there was more than one victim of the late-night or early-morning attack on [the victim]. Likewise, the State presented no proof that, at the time he entered the [appellant's] motel room, Detective Mason possessed any information which suggested that the victim was killed anywhere other than the driveway in which her body was discovered, that the motel was the scene of the victim's murder, or that the victim and the [appellant] had had any recent contact with one another.

From our review of the record, we agree with the trial court that the initial, warrantless entry into room 121 was illegal. However, our review is not yet complete. After his initial, warrantless entry into room 121, Detective Mason obtained a search warrant for the appellant's room. Accordingly, we must now determine the validity of the search of the room which was conducted pursuant to the search warrant.

b. Search Warrant for Room 121

The appellant claims that the affidavit supporting the issuance of the search warrant contained misleading or false information. He claims that without this information, the affidavit failed to establish probable cause to search his motel room. Contrarily, the State argues that the affidavit supports the issuance of the search warrant. Our supreme court has explained that

> [t]he Fourth Amendment to the United States Constitution requires that search warrants issue only "upon probable cause, supported by Oath or affirmation." Article I, Section 7 of the Tennessee Constitution precludes the issuance of warrants except upon "evidence of the fact committed." Therefore, under both the federal and state constitutions, no warrant is to be issued except upon probable cause.

State v. Henning, 975 S.W.2d 290, 294 (Tenn. 1998) (footnote and citations omitted). "A showing of probable cause requires, generally, reasonable grounds for suspicion, supported by circumstances indicative of an illegal act." State v. Stevens, 989 S.W.2d 290, 293 (Tenn. 1999).

Moreover, "a finding of probable cause supporting issuance of a search warrant must be based upon evidence included in a written and sworn affidavit." Henning, 975 S.W.2d at 294. Specifically, this court has observed that "[p]robable cause to support the issuance of a warrant must appear in the affidavit, and judicial review of the existence of probable cause will not include looking to other evidence provided to or known by the issuing magistrate or possessed by the affiant." State v. Barbara Copeland, No. 03C01-9402-CR-00079, 1996 WL 368209, at *3 (Tenn. Crim. App. at Knoxville, June 28, 1996); see also State v. Moon, 841 S.W.2d 336, 337-38 (Tenn. Crim. App. 1992). Additionally, to establish probable cause, an affidavit must set forth facts from which a reasonable conclusion may be drawn that evidence will be found in the place to be searched. See State v. Norris, 47 S.W.3d 457, 470 (Tenn. Crim. App. 2000). Furthermore, "'affidavits must be looked at and read in a commonsense and practical manner', and . . . the finding of probable cause by the issuing magistrate is entitled to great deference." State v. Bryan, 769 S.W.2d 208, 211 (Tenn. 1989) (quoting State v. Melson, 638 S.W.2d 342, 357 (Tenn. 1982)). Moreover, we note that should certain portions of an affidavit be used impermissibly to determine probable cause, such portions may be redacted and the remainder of the affidavit examined to see if probable cause exists without the challenged statements. See State v. Carpenter, 773 S.W.2d 1, 6 (Tenn. Crim. App. 1989). Accordingly, we must review the affidavit to determine whether there was sufficient evidence contained therein to support the issuance of the search warrant.

In the instant case, the affidavit in support of the issuance of the search warrant, which affidavit was drafted by Detective Mason, provided, in pertinent part:

> Your affiant is a detective assigned to the Murder Squad of the Metropolitan Nashville Police Department, who has been assigned as one of the investigators on this case. . . . Probable cause is as follows: On December 12, 1999 at approximately 0630 the nude body of

Jennifer Kimbrough was found in the driveway at 14566 Old Hickory Blvd. Antioch Tennessee. The body of the victim had been beaten and possibly strangled. It was learned that this victim had been staying in a room of the Knight Inn at 1111 Bell Rd. Antioch Tennessee. Your affiant found through the motel records that said room to be searched is rented to James Wayne Kimbrough, who your affiant believes to be the victims husband. Detectives found the victim's wallet and identification as well as womens clothing and a towel with what appears to be blood on it in a trash can located near the parking lot of said hotel. There was no response at the door of said room. Your affiant believing James Wayne Kimbrough may have also been a victim of foul play entered the room and found that James Wayne Kimbrough had removed most of his [possessions]. Witnesses who were staying at said hotel stated to Detectives that there was an argument in the parking lot near the victim's room during the night preceding the discovery of the body. Your affiant is praying for a search warrant to be issued so that a complete search of the above listed room be conducted and forensic testing be conducted so that any evidence found can be sent to the proper crime lab for testing to be used in any Criminal Prosecution related to this case. Your affiant has also learned through the motel records that James Wayne Kimbrough has rented said room through the date of December 13, 1999.

On appeal, the appellant raises several complaints regarding the contents of this affidavit. Specifically, he challenges the use of the following information to establish probable cause: that the victim was staying in a room at Knights Inn, that the victim and the appellant were married, that the warrantless entry revealed that the room was devoid of possessions, and that there was an argument in the parking lot near the victim's room. The State concedes that no information exists specifically linking the victim with Knights Inn; however, the State argues that the remainder of the information was correctly included in the affidavit to establish probable cause.

The court began its review by noting that because the initial, warrantless entry into room 121 was illegal, the court could not consider the information obtained therein in determining probable cause. Thus, the portion of the affidavit which reads "[y]our affiant believing James Wayne Kimbrough may have also been a victim of foul play entered the room and found that James Wayne Kimbrough had removed most of his [possessions]," was not considered by the trial court in determining probable cause. We conclude that the trial court correctly found that this information should not have been used to establish probable cause.

Additionally, the trial court noted that the statement, "Witnesses who were staying at said hotel stated to Detectives that there was an argument in the parking lot near the victim's room during

-10-

the night preceding the discovery of the body," was "misleading because . . . the record does not provide a basis for the conclusion that the victim had ever stayed in the motel." The trial court determined that the proper course of action was to "excise the portion of the affidavit which refers to the victim." However, the court declined to find that the lack of information regarding the informants' veracity or basis of knowledge required the statement to be completely disregarded

This court has observed that the "probable cause requirement essentially encompasses the Aguilar-Spinelli two-pronged test adopted by our Supreme Court in State v. Jacumin [778 S.W.2d 430 (Tenn. 1989)]." State v. Tays, 836 S.W.2d 596, 600 (Tenn. Crim. App. 1992); see Spinelli v. United States, 393 U.S. 410, 89 S. Ct. 584 (1969); Aguilar v. Texas, 378 U.S. 108, 84 S. Ct. 1509 (1964). In other words, the hearsay statement relied upon by police must establish the informant's basis of knowledge and demonstrate the informant's reliability. However, our courts have also noted that the Aguilar-Spinelli test does not apply to "citizen informants." See State v. Luke, 995 S.W.2d 630, 636 (Tenn. Crim. App. 1998).

The trial court determined that "the informants were hotel guests who provided relatively innocuous information which did not implicate a particular person or persons in criminal activity." In other words, the trial court found that the informants were citizen informants, who are presumed to be reliable. We cannot conclude that the trial court erred in permitting this statement to be used in determining probable cause. However, given the paucity of information regarding the number or gender of the participants in the argument, we question the value of this statement to the determination of probable cause.

Next, the trial court found that Detective Mason recklessly disregarded the truth when he asserted in his affidavit that the victim had been staying in a room at Knights Inn. In State v. Little, 560 S.W.2d 403, 407 (Tenn. 1978), our supreme court held that "there are two circumstances that authorize the impeachment of an affidavit sufficient on its face, (1) a false statement made with intent to deceive the Court, whether material or immaterial to the issue of probable cause, and (2) a false statement, essential to the establishment of probable cause, recklessly made." The appellant bears the burden of establishing the allegation of perjury or reckless disregard by a preponderance of the evidence. See State v. Yeomans, 10 S.W.3d 293, 297 (Tenn. Crim. App. 1999).

As the trial court noted, there was no proof presented at the hearing on the motion to suppress or at trial that the victim had been staying at Knights Inn. Specifically, the trial court observed that the appellant's motel registration card bore only his name and indicated that the room had a single occupant. Moreover, Detective Mason could not recall the source of any information regarding the victim staying at the motel. As there was no proof presented during the hearing or at trial from which Detective Mason could have derived an inference that the victim was staying at Knights Inn, we agree with the trial court that the inclusion of this statement was false and recklessly made. Thus, the statement should not be considered when determining probable cause.

Contrarily, the court found that the assertion that Detective Mason believed the appellant to be the victim's husband was not false or recklessly made. The court stated that

although it would have been helpful for the State to provide the Court with additional information regarding the basis for the detectives' belief, the [appellant] had failed to prove that Detective Mason's statement concerning his belief was in fact false or that he made any alleged false statement recklessly, knowingly, or intentionally.

From our review of the record, we agree with the trial court. Although Detective Mason did not specify the source of his information, we conclude that the statement was reasonable based upon information gathered by Detective Mason in the course of his investigation. See State v. Dellinger, 79 S.W.3d 458, 470 (Tenn. 2002). Detective Mason had learned that the appellant and the victim, who shared a surname, were once arrested at the same time and they gave the same address upon their arrest. Detective Mason could reasonably infer, based upon this information, that some type of familial connection existed between the appellant and the victim. We conclude that the trial court correctly considered this information.

Ultimately, the trial court found that the pertinent portions of the affidavit should have read as follows:

> On December 12, 1999 at approximately 0630 the nude body of Jennifer Kimbrough was found in the driveway at 14566 Old Hickory Blvd. Antioch[,] Tennessee. The body of the victim had been beaten and possibly strangled. Your affiant found through the motel records that a motel room at Knights Inn at 1111 Bell Rd. Antioch Tennessee is rented to James Wayne Kimbrough, who your affiant believes to be the victim[']s husband. Detectives found the victim's wallet and identification as well as women[']s clothing and a towel with what appears to be blood on it in a trash can located near the parking lot of said hotel. There was not response at the door of said room. Your affiant believing James Wayne Kimbrough may have also been a victim of foul play entered the room. Witnesses who were staying at said hotel stated to Detectives that there was an argument in the parking lot near [James Kimbrough's] room during the night preceding the discovery of the body. Your affiant is praying for a search warrant to be issued so that a complete search of the above listed room be conducted and forensic testing be conducted so that any evidence found can be sent to the proper crime lab for testing to be used in any Criminal Prosecution related to this case. Your affiant has also learned through the motel records that James Wayne Kimbrough has rented said room through the date of December 13, 1999.

Based upon the contents of the affidavit after removal of the redacted statements, we conclude that there was sufficient probable cause to support the issuance of the search warrant. The

-12-

affidavit asserted that the victim and the appellant were married at the time of the offense. Moreover, the appellant was a registered guest at the Knights Inn near where the victim's body was discovered.[2] Further, several bloody items belonging to the victim were discovered in a trash can near the appellant's room at Knights Inn. Accordingly, we conclude that the search of the appellant's room at the Knights Inn was legal and the fruits of the search thereof were admissible.

### 2. Seizure of the Appellant

The appellant next contends that the seizure of his person was illegal because the seizure was not supported by probable cause. The appellant further alleges that his illegal seizure tainted subsequently given statements, photographs of his hands, and his consent to search his vehicle. To address the appellant's concerns, we must first determine if the appellant was seized and if the seizure was legal.

In relation to the Fourth Amendment, our courts have recognized three distinct types of interactions between law enforcement and the citizenry, namely "(1) a full scale arrest which must be supported by probable cause; (2) a brief investigatory detention which must be supported by reasonable suspicion; and (3) brief police-citizen encounters which require no objective justification." State v. Daniel, 12 S.W.3d 420, 424 (Tenn. 2000) (citations omitted). Moreover, "'[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.'" Id. (citing Terry v. Ohio, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 1879 n.16 (1968)). In other words, "a 'seizure' implicating constitutional concerns occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave." Id. at 425. In determining when an encounter becomes a seizure, a court should consider all of the circumstances pertaining to the encounter. Id. Some relevant factors are as follows:

> the time, place and purpose of the encounter; the words used by the officer; the officer's tone of voice and general demeanor; the officer's statements to others who were present during the encounter; the threatening presence of several officers; the display of a weapon by an officer; and the physical touching of the person of the citizen.

Id. at 426. Furthermore,

> [i]n Tennessee, an arrest is more specifically defined as the "taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest." An arrest may be

---

[2] The trial court took judicial notice of the fact that "Old Hickory Boulevard becomes Bell Road in the Antioch area, and that the Antioch area is relatively small."

> affected without formal words or a station house booking. However,
> there must be actual restraint on the arrestee's freedom of movement
> under legal authority of the arresting officer.

State v. Crutcher, 989 S.W.2d 295, 301-02 (Tenn. 1999) (citations omitted).

Detective Mason testified that he had his gun drawn when he approached the appellant as he was driving away from The Place. Thereafter, Detective Mason and another officer pulled the appellant from his vehicle, placed him face down upon the ground, and handcuffed him. The officers then placed the appellant in the back of a police vehicle. We conclude that this was more than a brief police-citizen encounter and more than an investigatory stop. The nature of the appellant's detention rose to the level of an arrest. See State v. Johnson, 980 S.W.2d 414, 422 (Tenn. Crim. App. 1998) (explaining that detention for the purpose of custodial interrogation triggers the safeguards against illegal arrest). Accordingly, the actions of police needed to be supported by probable cause. See State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997).

Tennessee Code Annotated section 40-7-103(a)(3) (2003) provides that an officer may arrest a person without a warrant "[w]hen a felony has in fact been committed, and the officer has reasonable cause for believing the person arrested to have committed it." In the instant case, upon the discovery of the victim, it was clear that a homicide had been committed. Homicide, in its varying forms, is a felony. See Tenn. Code Ann. § 39-13-201, *et. seq.* (2003); see also State v. Larico S. Ficklin, No. W2000-01534-CCA-R3-CD, 2001 WL 1011470, at *7 (Tenn. Crim. App. at Jackson, Aug. 27, 2001). Thus, our next inquiry is whether Detective Mason reasonably believed the appellant committed the offense. See State v. Lewis, 36 S.W.3d 88, 98 (Tenn. Crim. App. 2000); see also State v. Robert A. Cummins, No. W2000-00277-CCA-R3-CD, 2001 WL 912792, at *5 (Tenn. Crim. App. at Jackson, Aug. 10, 2001) ("Our courts make little, if any, distinction between the terms 'reasonable cause' and 'probable cause' in determining whether there exists a basis for an arrest."). Our supreme court has explained that "a reasonable ground for suspicion, supported by circumstances indicative of an illegal act," constitutes probable cause. State v. Henning, 975 S.W.2d 290, 294 (Tenn. 1998).

Courts should determine the existence of probable cause after assessing all of the information available to the officer at the time of arrest. See State v. Woods, 806 S.W.2d 205, 212 (Tenn. Crim. App. 1990). To this end, Tennessee Rule of Criminal Procedure 4(b) provides that in the application for the issuance of an arrest warrant, "[t]he finding of probable cause shall be based upon evidence, which may be hearsay in whole or in part provided there is a substantial basis for believing the source of the hearsay to be credible and for believing that there is a factual basis for the information furnished." It has long been established that "[w]hile this rule applies itself particularly to warrants for arrest, the same principle must be considered applicable to establish probable cause where an arrest has been made without a warrant." State v. Raspberry, 640 S.W.2d 227, 228 (Tenn. Crim. App. 1982); see also State v. Tays, 836 S.W.2d 596, 600 (Tenn. Crim. App. 1992).

The trial court determined that

[w]hen considered as a whole, the information available to Detective Mason established sufficient probable cause to arrest the [appellant]. Through a computer search of the victim's arrest record as well as through a conversation with the [appellant's] father, Detective Mason learned that the victim and [the appellant] had previously had a relationship. Moreover, because the [appellant] and his father resided at the same address and the [appellant's] father was looking for the [appellant] and victim because they had robbed him, it was reasonable for Detective Mason to conclude that the relationship between the [appellant] and victim was ongoing. . . . Detective Mason was also aware that the [appellant] had rented a motel room in the same general area in which the victim's body was discovered, that the victim was nude at the time her body was discovered, and that women's clothing, a towel with what appeared to be blood, and the victim's wallet and identification were discovered in a dumpster in the vicinity of the [appellant's] motel room. Finally, motel guests heard an argument near the [appellant's] motel room the night before the victim's body was discovered.

Based upon the foregoing, the trial court found that Detective Mason had probable cause to arrest the appellant for homicide. Our review of the relevant facts leads us to the same conclusion. We agree with the trial court.

## a. Search of the Appellant's Vehicle

The appellant next contends that the search of his vehicle was illegal. The appellant asserts that he "was illegally seized and gave consent [to search his vehicle] only after both express and implied coercion by Detective Mason."

Our supreme court has said that, "[i]t is, of course, well settled that one of the exceptions to the warrant requirement is a search conducted pursuant to consent." State v. Bartram, 925 S.W.2d 227, 230 (Tenn. 1996) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043-44 (1973), and State v. Jackson, 889 S.W.2d 219, 221 (Tenn. Crim. App. 1993)). "The sufficiency of consent depends largely upon the facts and circumstances in a particular case." Jackson, 889 S.W.2d at 221. The prosecution bears the burden of proving that the appellant freely and voluntarily gave consent. See State v. McMahan, 650 S.W.2d 383, 386 (Tenn. Crim. App. 1983). We further observe that "'[t]he existence of consent and whether it was voluntarily given are questions of fact.'" State v. Ashworth, 3 S.W.3d 25, 29 (Tenn. Crim. App. 1999) (quoting McMahan, 650 S.W.2d at 386). In determining the validity of consent, this court has utilized the following factors:

(1) voluntariness of the accused's custodial status; (2) the length of the detention of the accused before he or she gave consent; (3) the presence of coercive police procedures; (4) the accused's awareness

of his or her right to refuse to consent; (5) the accused's age, education and intelligence; (6) whether the accused understands his or her constitutional rights; (7) the extent of his or her previous experience with the police; and (8) whether the accused was injured, intoxicated, or in ill health.

State v. Waylon D. Knott, No. M2000-02524-CCA-R3-CD, 2001 WL 846031, at *3 (Tenn. Crim. App. at Nashville, July 27, 2001).

As we concluded earlier, the seizure of the appellant was not illegal. Therefore, any search conducted of the appellant's vehicle was not tainted by an illegal seizure. The trial court found that while the appellant was in custody at the time he gave consent to search his vehicle, that factor was not dispositive. Indeed, the court accredited Detective Mason's assertion that he read the consent form to the appellant "and that the [appellant] appeared to understand his rights." The consent form clearly elucidated the appellant's right to refuse consent. Further, the court noted that there was no evidence that the appellant was threatened with physical harm, nor was he made any promises in exchange for his consent to search his vehicle. The trial court summarized its findings as follows:

> While the circumstances surrounding the [appellant's] arrest do not present an ideal situation for a consent request, it does not follow that the consent was involuntary. The [appellant] was forcibly detained as a result of the officers' justifiable belief that he had committed a homicide days or hours prior to that detention. Despite the nature of the arrest, the remaining circumstances are such that the Court has no hesitation concluding that the [appellant] voluntarily consented to a search of his vehicle. Moreover, the [appellant] offered no limitations as to the scope of the search and, to the Court's knowledge, never withdrew his consent. Therefore, any search or searches of the [appellant's] vehicle were valid. . . .

We can find no evidence in the record to dispute the trial court's findings. Accordingly, we, like the trial court, conclude that the appellant's consent to search his vehicle was valid.[3]

### b. Photographs and Statement

The appellant next contends that the statements made by and the photographs taken of the appellant after he was transported to the police station were illegally obtained and should have been excluded at trial. Specifically, the appellant maintains:

---

[3] Additionally, we note that the trial court found that police "could have searched the passenger compartment incident to the [appellant's] arrest and the entire vehicle as an inventory search." However, because we have concluded that the search was valid pursuant to consent, we have chosen not to further address this issue.

The statements made by the appellant are fruits of the illegal seizure and are inadmissible. Although there were <u>Miranda</u> warnings issued, the only valid warnings came after Mr. Kimbrough had been questioned, his clothing seized, and submitted to a polygraph examination. . . .

Detective Carrell did not read the appellant his <u>Miranda</u> rights until after the polygraph test was performed and until after his clothing was seized and pictures were taken of his hands. Mr. Kimbrough was not read his <u>Miranda</u> rights until 8:35 p.m. on December 12, 1999, even though he was arrested around 4:00 p.m. on the same day. The appellant was in continuous custody from the time of his arrest until the time when he was taken to the police department to be questioned. There were no intervening circumstances, as he was not given access to talk to counsel or family members while at the police station. Finally, Detective Mason's conduct was flagrant and for the purpose of intimidating the appellant. The observations of Mr. Kimbrough's clothing and his hands, the photographs of his hands were fruits of the illegal seizure and should not have been admissible at trial.

The trial court found that the appellant's first statement to police violated <u>Miranda</u> because the appellant was inadequately advised of his rights; therefore, the State was not allowed to use the statement during its case-in-chief. The trial court also noted that the search warrant authorized law enforcement officials to search the appellant's person as well as his motel room. Therefore, police were authorized to seize the appellant's clothing and photograph his hands. Further, the trial court found that the seizure of the appellant's clothing and the photographing of his hands were done pursuant to searches following a lawful arrest. Finally, the trial court found that the second statement made by the appellant was admissible because the appellant had at that time received proper <u>Miranda</u> warnings and was free from coercion.

From our thorough examination of the record, we can discern no instance in which any statements made by the appellant were admitted at trial. Furthermore, the appellant's argument that the photographs of his hands should have been excluded are based upon his contention that the photographs were the result of an illegal arrest. We have previously concluded that the appellant was not the subject of an illegal arrest and was in legal custody at the time Detective Carrell observed in plain view the scratches on the appellant's hands. These photographs were not illegally obtained. Moreover, as the trial court noted, items of the appellant's clothing were seized pursuant to a search warrant. Accordingly, these items were admissible at trial.

B. Sufficiency of the Evidence

-17-

The appellant argues that the trial court erred in denying the appellant's motion for judgments of acquittal on the charged offenses due to a lack of proof. Initially, we note that this court has observed that "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000). Therefore, we will address the appellant's complaint as a challenge to the sufficiency of the evidence.

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no "reasonable trier of fact" could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The appellant was convicted of first degree premeditated murder, first degree murder of the victim committed during the perpetration of spousal rape, which offense is otherwise known as felony murder, and two counts of spousal rape.[4] In order to obtain the appellant's conviction for first degree premeditated murder, the State was required to prove, beyond a reasonable doubt, that the appellant committed the "premeditated and intentional killing of [the victim]." Tenn. Code Ann. § 39-13-202(a)(1) (1997). Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself. [However,] [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id. at (d). We also note that, "[a] homicide, once proven, is presumed to be second degree murder, and the state has the burden of proving premeditation to raise the offense to first degree murder." State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000). Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon certain circumstances to infer premeditation. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the appellant's declarations of intent to kill; (3) the appellant's planning activities before the killing; (4) the manner of the killing, including the appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a

---

[4] The jury found the appellant guilty of both premeditated first degree murder and felony murder. The trial court merged the appellant's conviction for premeditated first degree murder into his felony murder conviction.

particularly cruel manner; (5) the appellant's demeanor before and after the killing, including a calm demeanor immediately after the killing. See Pike, 978 S.W.2d at 914-915; State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Additionally, this court has suggested that facts concerning the prior relationship between the appellant and the victim from which motive could be inferred is indicative of premeditation. See State v. Gentry, 881 S.W.2d 1, 5 (Tenn. Crim. App. 1993).

Felony murder is defined as "[a] killing of another committed in the perpetration of . . . any . . . rape." Tenn. Code Ann. § 39-13-202(a)(2) (1997). Spousal rape is defined as the unlawful sexual penetration of one spouse by another when the appellant causes serious bodily injury to the victim. See Tenn. Code Ann. § 39-15-507(b)(1)(B) (1997). This court has previously concluded that the term "unlawful" generally refers to non-consensual acts. See State v. Jones, 889 S.W.2d 225, 227 (Tenn. Crim. App. 1994). Tennessee Code Annotated section 39-13-501(7) (1997) provides that sexual penetration is "sexual intercourse . . . or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's . . . body, but emission of semen is not required."

On count three, the appellant was charged with spousal rape based upon the penetration of the victim's vagina. On count four, the appellant was charged with spousal rape based upon the penetration of the victim's anus. The State elected to proceed on count three, the vaginal rape, as the underlying felony for the appellant's felony murder charge. At trial, Dr. Pillow testified that the victim's vagina bore multiple, extensive lacerations which produced bleeding, indicating that the victim was alive at the time of the penetration. Dr. Pillow opined that the lacerations were consistent with penetration by a capped beer bottle. A capped beer bottle coated in the victim's blood was found along with several of the victim's personal belongings in a trash can near the appellant's room at the Knights Inn. Further, Dr. Pillow asserted that there were multiple lacerations of various sizes around the victim's anus and into her anal opening. The lacerations had bled, indicating the victim was alive at the time of penetration. During the autopsy, Dr. Pillow discovered an aerosol can lodged in the victim's abdomen. The aerosol can was inserted into the victim's anus and pushed into her abdominal cavity. However, Dr. Pillow maintained that the cause of death was manual strangulation by a hand or hands.

Because the crimes were sexual in nature, Dr. Pillow swabbed the victim's breasts, and one of the swabs tested positive for the appellant's DNA. Additionally, the appellant was the last person seen with the victim before her death. Moreover, the appellant admitted that he left the bar with the victim, and they talked for a while in his car. The appellant had been wearing a gauze bandage on his hand early in the evening while at The Place. However, when he returned to The Place after leaving with the victim, the appellant was no longer wearing the bandage. Police discovered a gauze bandage with the appellant's DNA in the trash can along with other items belonging to the victim. Further, the tissue recovered from the victim's mouth also bore the appellant's DNA. Also, the appellant was upset that the victim engaged in prostitution, stating that he was "tired" of it. From the foregoing evidence, we conclude that there was overwhelming proof to support the appellant's convictions for felony murder and two counts of spousal rape. Moreover, the proof revealed that the victim was brutally raped and tortured before she was strangled, the victim struggled during the

strangulation, and it would have taken a significant length of time to end the victim's life. Therefore, we conclude that the proof supports the appellant's conviction for first degree premeditated murder.

## C. Sentencing

After the appellant was found guilty of felony murder, the jury, pursuant to a capital sentencing hearing, imposed a sentence of life imprisonment without the possibility of parole. Subsequently, the trial court held a sentencing hearing regarding the spousal rape convictions and imposed a sentence of fifteen years for each conviction. The trial court further ordered the spousal rape convictions to be served concurrently with each other but consecutively to the sentence for felony murder for a total effective sentence of life without the possibility of parole plus fifteen years. On appeal, the appellant raises several complaints relating to his sentences for felony murder and spousal rape.

### 1. Felony Murder Sentencing

The appellant claims several instances of error on the part of the trial court during the penalty phase of his felony murder conviction. Specifically, the appellant maintains that the trial court erred in refusing to allow testimony regarding the impact of sentencing upon the appellant's family, in admitting certain graphic photographs of the victim's injuries, in allowing the State to display a photograph of the victim on a projector screen during closing argument, and in denying the appellant's requested instruction on the issue of residual doubt. Additionally, the appellant claims that there was insufficient proof of the aggravating factors to justify the imposition of the sentence of life without the possibility of parole.

### a. Effect of Appellant's Sentencing

The appellant contends that the trial court "erred in refusing to allow the jury to hear and consider the impact of sentencing on the [appellant's] family." Specifically, the appellant complains that the trial court refused to allow the appellant's mother to testify as to "what impact a death sentence for her son would have on her." The appellant maintains that such evidence could have been considered by the jury as mitigation evidence.

We note that the admissibility of evidence at a capital sentencing hearing is governed by Tennessee Code Annotated section 39-13-204(c) (2003), which statute provides in pertinent part:

> In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors. Any such evidence which

the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence; provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the constitution of the United States or the constitution of Tennessee.

See also Tenn. R. Evid. 401-403. Our supreme court has noted that "Tennessee Code Annotated section 39-13-304 . . . for the liberal admission of mitigation evidence in the penalty phase and ensures that a jury will have as much information as possible in making its sentencing determination." State v. Carter, 114 S.W.3d 895, 905 (Tenn. 2003). However, in the instant case, we hesitate to conclude that the trial court abused its discretion in refusing to allow the appellant's mother to testify as to the impact the appellant's death would have upon her. The appellant's mother was allowed to testify at length regarding the abusive nature of the appellant's father and his brother also testified extensively regarding the horrific nature of the appellant's childhood. The appellant's mother further revealed that until the appellant was imprisoned for the instant offenses, she had not seen the appellant since he was an infant. Thus, in light of the presence of ample mitigation evidence, we conclude that if the trial court's failure to allow the testimony of the appellant's mother regarding the impact of his death were error, such error was clearly harmless. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b).

### b. Photographs of the Victim's Injuries

The appellant next complains about the use of certain photographs during the penalty phase. Prior to the commencement of the sentencing hearing on the felony murder conviction, the appellant objected to the admission of several photographs of the victim's injuries. The photographs were taken during the autopsy and depicted the nature of the injuries to the victim's vagina, anus, face, and neck. The appellant contends that the photographs of the victim's injuries were extremely prejudicial and thus inadmissible. Contrarily, the State argues that the photographs "were admitted to establish that the 'murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death.'"

Generally, the decision regarding the admissibility of photographs lies within the sound discretion of the trial court and that decision will not be overturned on appeal absent a showing of an abuse of that discretion. See State v. Carruthers, 35 S.W.3d 516, 576 (Tenn. 2000); State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). "Moreover, the modern trend is to vest more discretion in the trial judge's rulings on admissibility." Carruthers, 35 S.W.3d at 577.

As we noted earlier, trial courts possess great discretion over the admissibility of evidence during a capital sentencing hearing. In ruling upon the admissibility of the photographs, the trial court noted that the photographs were relevant to prove the heinous, atrocious, and cruel aggravating factor advanced by the State. Moreover, the court found that the photographs had great probative

value which outweighed any prejudicial effect. Ultimately, however, the trial court limited the number of photographs admissible. Our examination of the photographs reveals that, while unpleasant, they were highly relevant to prove the "heinous, atrocious, or cruel" aggravating factor proposed by the State. See State v. Hall, 8 S.W.3d 593, 602 (Tenn. 1999). We note that our supreme court "has repeatedly held that photographs relevant to proving the aggravating circumstance that the murder was especially heinous, atrocious, or cruel are admissible in the penalty phase." Carter, 114 S.W.3d at 903. Therefore, we conclude that the trial court did not err in allowing the admission of photographs of the victim's injuries.

### c. Photograph of the Live Victim

The appellant also complains regarding the display of a photograph of the victim on a large projector screen during the prosecution's closing argument. The appellant argues that the use of this photograph was "excessive" and "did not contribute anything to the jury except undue emotion."

In its order denying the appellant's motion for new trial, the trial court noted that the appellant's "argument regarding the size of the screen upon which the State intended to show the photograph was a bit of an exaggeration." Additionally, the court stated that the photograph was "only briefly displayed by the State during its closing argument. Moreover, the State did not present an overly-emotional closing argument."

The admission of the photograph of the victim when she was alive was within the discretion of the trial court. However, as a prerequisite to admissibility, the relevance of the photograph must be established. It is well-established that closing argument is an important tool for both parties during a trial; thus, counsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments. See Carruthers, 35 S.W.3d at 577-78 (appendix). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

Importantly, we note that the appellant did not object to the admission of the photograph itself, merely to the manner in which it was displayed. The appellant specifically stated, "I don't have any objections, if they wanna hold the photograph, if they wanna present it to the jury." In overruling the appellant's objection to the manner of display, the trial court stated that "if it gets to the point of being a plea for vengeance or sympathetic motivation, then I'll step in." The trial court did not find that the State used the victim's photograph to unduly prejudice or emotionally sway the jury. While we question the relevance of the live photograph of the victim, we note that the record does not reflect the size of the photographic display. Therefore, we defer to the judgment of the trial court. However, if the display of the photograph were error, such error is harmless.

### d. Residual Doubt Instruction

The appellant next complains that the trial court "erred in denying [his] proposed detailed instruction on the issue of residual doubt as a mitigating factor." It is well-established that the trial court must give the jury "a complete charge on the law applicable to the facts of the case." State v. Phipps, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994). In Tennessee, it is required that "a defendant be allowed to present evidence at a []sentencing hearing to establish residual doubt as a nonstatutory mitigating circumstance." State v. Hartman, 42 S.W.3d 44, 55 (Tenn. 2001) (citing State v. Teague, 897 S.W.2d 248, 256 (Tenn. 1995)). Once the issue of residual doubt is raised by the evidence, a jury instruction on residual doubt should be given. See State v. Andrew Thomas, No. W2001-02701-CCA-R3-DD, 2004 WL 370297, at *33 (Tenn. Crim. App. at Jackson, Feb. 27, 2004), perm. to appeal denied, (Tenn. 2004). Residual doubt evidence is typically established by proof which casts doubt upon a defendant's guilt, which proof is not limited to evidence mitigating a defendant's culpability for the offense. See Hartman, 42 S.W.3d at 57.

In the instant case, the appellant requested the following residual doubt instruction:

> You must also consider as a mitigating circumstance any residual or lingering doubt you may have about [the appellant's] guilt. Residual or lingering doubt differs from reasonable doubt. You have already found beyond a reasonable doubt and to a moral certainty that [the appellant] is guilty. Yet, some genuine doubt may still exist. It may reflect the opinion of one juror or several. The absence of an absolute certainty about guilt can be a valid reason for not imposing the ultimate and irrevocable penalty of death.

> Unless each and every one of you can say with certainty that you do not possess a residual or lingering doubt about the degree of the homicide committed and about the identity of the person who committed it, then as a jury you must consider the existence of such a residual or lingering doubt as a mitigating circumstance that warrants a sentence of life imprisonment rather than death.

The trial court denied the appellant's request to give the foregoing instruction, choosing instead to give a more generalized instruction. The trial court's instruction on residual doubt provided:

> Tennessee law provides that, in arriving at the punishment, the Jury shall consider, as previously indicated, any mitigating circumstances raised by the evidence, which shall include, but are not limited to, the following:

> . . . .

> 6. Any residual or lingering doubts you may have about the [appellant's] participation in the commission of the offense. Residual

-23-

doubt means doubt somewhere between reasonable doubt, as defined herein, and absolute certainty of guilt.

From our review of the jury instructions, we conclude that the trial court's residual doubt instruction was more than sufficient and "served to give the jury the opportunity and duty to consider any residual doubts about his culpability." Thomas, No. W2001-02701-CCA-R3-DD, 2004 WL 370297, at *33. Moreover, we note that the appellant's proposed instruction appears to call for absolute certainty of the appellant's guilt before imposing sentence. Our case law does not mandate the imposition of such a heavy burden as a prerequisite to capital sentencing. See State v. Bigbee, 885 S.W.2d 797, 813 (Tenn. 1994). This issue is without merit.

### E. Aggravating Factors

The appellant styles his next issue as a challenge to the sufficiency of the evidence supporting the existence of the aggravating factors justifying the imposition of a sentence of life without the possibility of parole. However, the crux of the appellant's argument is that "the mitigation presented, especially in the form of residual doubt, should have resulted in a sentence of life and not life without parole." We will briefly address both of these complaints.

Upon a unanimous finding that the State has proven beyond a reasonable doubt one of the statutorily enumerated aggravating factors set forth in Tennessee Code Annotated section 39-13-204(i), "the jury shall, in its considered discretion, sentence the defendant either to imprisonment for life without the possibility of parole or imprisonment for life." Tenn. Code Ann. § 39-13-207(c) (2003); see also Tenn. Code Ann. § 39-13-204(i) (2003). In the instant case, the jury found not the existence of the following aggravating factors:

> (1) The appellant was previously convicted of one or more felonies, other than the present charge, the statutory elements of which involve the use of violence to the person.

> (2) The murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical . . . abuse, beyond that necessary to . . . produce death.

> (3) The murder was knowingly committed, solicited, directed, or aided by the [appellant] while the [appellant] had a substantial role in committing or was fleeing after having a substantial role in committing spousal rape.

See Tenn. Code Ann. § 39-13-204(i)(2),(5), and (7).

First, we note that the appellant stipulated that he had three prior convictions for aggravated assault. See State v. Berry, 141 S.W.3d 549, 570 (Tenn. 2004). On appeal, the appellant does not

challenge the application of this aggravating factor. From our review of the record, we conclude that the evidence supports the application of this factor.

Further, proof of the heinous, atrocious, and cruel aggravator was overwhelming. As we have previously noted, Dr. Pillow detailed the extensive and horrific injuries the victim received just before her death. Among the violations was the insertion of an aerosol can into the victim's rectum, which can was then shoved by a foreign object into the victim's abdominal cavity. Additionally, the victim was brutally raped with a capped beer bottle. Dr. Pillow asserted that these injuries would have been extremely painful. Moreover, Dr. Pillow testified that the victim was beaten and that she died by means of manual strangulation, which would have taken three to seven minutes to result in the victim's death. See State v. Vann, 976 S.W.2d 93, 104 (Tenn. 1998). Further, evidence indicated that the victim struggled with her attacker.

As the final aggravating factor, the jury found that "the murder was knowingly committed, solicited, directed, or aided by the [appellant] while the [appellant] had a substantial role in committing or was fleeing after having a substantial role in committing spousal rape." Tenn. Code Ann. § 39-13-204(i)(7). The proof adduced at trial and at the capital sentencing hearing amply supports the finding that the appellant raped his wife and that he caused her death nearly contemporaneously with that rape. Moreover, the strangulation of the victim would have required the application of substantial force and would have lasted for three to seven minutes. Therefore, the evidence is sufficient to support the application of this aggravating factor. See State v. Butler, 980 S.W.2d 359, 362-63 (Tenn. 1998); State v. Hodges, 7 S.W.3d 609, 629 (Tenn. Crim. App. 1998).

Upon our review of the record, we conclude that the evidence supports the jury's determination that the aggravating factors outweigh any applicable mitigating factors. Accordingly, the imposition of the sentence of life imprisonment without the possibility of parole was justified.

### 2. Spousal Rape Sentencing

As we have noted, subsequent to the appellant's convictions and the imposition of his sentence of life imprisonment without the possibility of parole, the trial court conducted a sentencing hearing to determine the appropriate sentence for the appellant's spousal rape convictions. At the conclusion of that hearing, the trial court imposed a sentence of fifteen years for each conviction. The court ordered the appellant to serve his sentences for his spousal rape convictions concurrently with each other but consecutively to his sentence for felony murder. On appeal, the appellant has raised two separate issues regarding his sentences for spousal rape. The appellant challenges the length of his individual sentences and the imposition of consecutive sentencing. We will address each of these issues in turn.

### 1. Length of Sentence

Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d) (2003). In conducting its de novo review, this court considers

the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the appellant in his own behalf; and (7) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210 (2003); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence(s). See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

To begin a sentencing determination, a court should begin at the presumptive minimum, then "enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence as appropriate for the mitigating factors." Tenn. Code Ann. § 40-35-210(e). Spousal rape is a Class C felony. See Tenn. Code Ann. § 39-13-507(2)(A) (2003). The presumptive sentence for a Class C felony is the minimum sentence within the appropriate range. See Tenn. Code Ann. § 40-35-210(c). The appellant was sentenced as a standard Range III persistent offender, and on appeal, does not challenge this designation. See Tenn. Code Ann. § 40-35-107(a)(1) (2003). Accordingly, the presumptive sentence for the appellant's Class C felony convictions was ten years. See Tenn. Code Ann. § 40-35-112(c)(3) (2003).

The trial court applied five enhancement factors to the appellant's sentence:

(2) The appellant has a previous history of criminal convictions in addition to those necessary to establish the appropriate range;

(6) The appellant treated the victim with exceptional cruelty during the commission of the offense;

(7) The personal injuries inflicted upon the victim were particularly great;

(8) The offense involved a victim and was committed to gratify the appellant's desire for pleasure or excitement; and

(9) The appellant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community.

Tenn. Code Ann. § 40-35-114(2) and (6)-(9) (2003).

From our review of the record, we conclude that there are sufficient facts to warrant the application of each of the enhancement factors found by the trial court. In fact, on appeal the

-26-

appellant did not challenge the trial court's findings. However, we are compelled to note that the Supreme Court released Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004), after the submission of briefs in the instant case. This court has recently recognized that Blakely "calls into question the continuing validity of our current sentencing scheme." State v. Julius E. Smith, No. E2003-01059-CCA-R3-CD, 2004 WL 1606998, at *4 (Tenn. Crim. App. at Knoxville, July 19, 2004); see also State v. Michael Wayne Poe, No. E2003-00417-CCA-R3-CD, 2004 WL 1607002, at *9 (Tenn. Crim. App. at Knoxville, July 19, 2004), perm. to appeal denied, (Tenn. 2004).

In Blakely, the Supreme Court held that

> the "statutory maximum" for Apprendi[v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000)] purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority.

Blakely, 524 U.S. at __, 124 S. Ct. at 2537. Essentially, Blakely does not dispute the appropriateness of enhancement factor (2), which is based on the existence of a defendant's prior criminal history; yet, the constitutionality of the remainder of our statutory enhancement factors without such facts being found by a jury or admitted by a defendant remains to be seen. Accordingly, based upon Blakely and the facts adduced in the instant case, we are confident that the trial court did not err in applying enhancement factor (2) to the appellant.

Additionally, in the instant case, in sentencing the appellant for felony murder, the jury found beyond a reasonable doubt that "the [felony] murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical . . . abuse, beyond that necessary to . . . produce death." We conclude that encompassed in this finding was a determination that the underlying felony, spousal rape, was likewise heinous, atrocious, or cruel. Therefore, enhancement factor (6), that the appellant treated the victim with exceptional cruelty during the commission of the offenses, was supported by jury findings. See State v. Madden, 99 S.W.3d 127, 139 (Tenn. Crim. App. 2002); cf. State v. Chester Wayne Walters, No. M2003-03019-CCA-R3-CD, 2004 WL 2726034, at *22 (Tenn. Crim. App. at Nashville, Nov. 30, 2004).

Next, we turn to the application of enhancement factor (7), that the personal injuries inflicted upon the victim were particularly great. See Tenn. Code Ann. § 40-35-114(7). As we stated earlier, spousal rape is defined as the unlawful sexual penetration of one spouse by another when the appellant cause serious bodily injury to the victim. See Tenn. Code Ann. § 39-15-507(b)(1)(B) (1997). Ordinarily, if an enhancement factor is an essential element of the offense, the factor may

not be used to enhance the sentence. See Tenn. Code Ann. § 40-35-114. However, if the victim "'sustained appreciable personal injuries beyond those incidental to the crime,'" the enhancement factor may be utilized. State v. Dean, 76 S.W.3d 352, 380 (Tenn. Crim. App. 2001). We conclude that, in light of the undisputed evidence that the victim was alive at the time of the injuries were inflicted, the jury's finding of exceptional cruelty in the form of physical abuse would support the application of this enhancement factor.

In examining the remaining enhancement factors found by the court, we note that the record does not indicate that the jury found the existence of enhancement factors (8) or (9). Additionally, there is nothing in the record reflecting that the appellant admitted the existence of these two enhancement factors. Therefore, we are constrained to conclude that the application of these factors was error in light of Blakely. See State v. Terry Lynn Byington, No. E2003-02316-CCA-R3-CD, 2004 WL 1606993, at *4 (Tenn. Crim. App. at Knoxville, July 19, 2004), perm. to appeal denied, (Tenn. 2004).

Additionally, we note that the trial court did not find the existence of any mitigating factors. On appeal, the appellant does not contend that the trial court erred in failing to find any mitigating factors. Our review of the record likewise reveals no mitigation. Therefore, notwithstanding the erroneous application of enhancement factors (8) and (9), we conclude that the three enhancement factors remaining justify the trial court's imposition of the maximum sentence of fifteen years.

## 2. Consecutive Sentencing

Finally, we turn to the appellant's complaints regarding the imposition of consecutive sentencing. Initially, we note that "[w]hether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court." State v. Adams, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997). Tennessee Code Annotated section 40-35-115(b) (2003) contains the discretionary criteria for imposing consecutive sentencing.[5] See also State v. Wilkerson, 905 S.W.2d 933, 936 (Tenn. 1995). The trial court may impose consecutive sentencing upon finding the existence of any one of the following criteria:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;

---

[5] This court has previously determined that Blakely does not impact Tennessee's consecutive sentencing scheme. See State v. Rose Marie Hernandez, No. M2003-01756-CCA-R3-CD, 2004 WL 2984844, at *4 (Tenn. Crim. App. at Nashville, Dec. 16, 2004); State v. Earice Roberts, No. W2003-02668-CCA-R3-CD, 2004 WL 2715316, at *12 (Tenn. Crim. App. at Jackson, Nov. 23, 2004).

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation;  or

(7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b)(1)-(7) (2003).

In the instant case, the trial court found three criteria.[6] Specifically, the trial court found that the appellant was an offender whose record of criminal activity is extensive; that the offenses were committed while on probation, and that the appellant is a dangerous offender.  See Tenn. Code Ann. § 40-35-115(2), (4), and (6).

The record reflects that the appellant's criminal history consists of multiple felony and misdemeanor convictions, warranting the trial court's finding that the appellant's criminal history is extensive.  Additionally, there is proof in the record that the appellant was on probation for theft offenses when the instant offense was committed.  Moreover, the sheer brutality and savagery of the offenses illustrate that the appellant has little regard for human life.  However, our analysis is not yet complete.

In order to find that a defendant is a dangerous offender, a court must also find that "(1) the sentences are necessary in order to protect the public from further misconduct by the defendant and (2) 'the terms are reasonably related to the severity of the offenses.'" Wilkerson, 905 S.W.2d at 938;

---

[6] The appellant does not dispute the application of any of these criteria.

see also State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).  In applying the dangerous offender criteria, the trial court noted:

> And, as I've already mentioned and will mention again, if this case doesn't qualify for consecutive sentencing, under State versus Wilkerson, which talks about the necessity of protecting the public and that it must reasonably relate to the severity of the offenses, and goes on to say that not every case serious in nature is necessarily one that would indicate a person is a dangerous offender; that, in the Court's opinion, this factual scenario merits that finding.

We conclude that the trial court did not err in imposing consecutive sentencing.

### III.  Conclusion

Finding no reversible error, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE